FILED
2019 Feb-27  AM 10:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BLACK WARRIOR RIVER-<br>KEEPER, INC. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. ENVIRONMENTAL | ) | |
| PROTECTION AGENCY; ACTING | ) | Case No. _____ |
| ADMINISTRATOR ANDREW | ) | |
| WHEELER, U.S. Environmental | ) | |
| Protection Agency; and ACTING | ) | |
| REGIONAL ADMINISTRATOR | ) | |
| MARY WALKER, U. S. | ) | |
| Environmental Protection Agency | ) | |
| Region 4 | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

### I. PRELIMINARY STATEMENT

1.    Plaintiff Black Warrior Riverkeeper, Inc. ("Riverkeeper") challenges the United States Environmental Protection Agency's ("EPA") failure to ensure that the State of Alabama's 2018 § 303(d) List included all waterbodies impaired by pollution as required by the Federal Water Pollution Control Act ("Clean Water Act"). This suit is brought under the Administrative Procedure Act ("APA")

challenging EPA's arbitrary approval of the State of Alabama's delisting (removal) of impaired waters from its 2018 § 303(d) list without requiring supporting evidence that these waters now meet applicable standards.

2.      EPA failed to consider all relevant information about Alabama's waterbodies and pollutants as required.  Instead, EPA approved the State of Alabama's arbitrary removal of certain waterbodies from Alabama's § 303(d) list, despite the fact that they had previously been determined to be impaired, without proper evidence that they are now meeting water quality standards.  As a result, these waters are not scheduled for the establishment of Total Maximum Daily Loads ("TMDLs") and will be excluded from the subsequent implementation of water-quality based point and nonpoint source pollution control measures that are necessary to restore these waters to health.[1]

3.      EPA is a federal agency subject to the APA.  5 U.S.C. § 701(b)(1).

4.      The APA provides that a court shall set aside agency "findings, conclusions, and actions" that are "arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  *See also Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007).

---

[1] *See* 40 CFR § 130.2(i).  A TMDL establishes the maximum amount of a pollutant allowed in a waterbody and serves as a planning tool for restoring water quality.

5.    The reviewing court must carefully "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971).

## II. JURISDICTION AND VENUE

6.    This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); and 28 U.S.C. §§ 2201-2202 (declaratory judgment action).

7.    Defendants are a federal agency and officers thereof.  Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(e) because the activities complained of include activities located in this District.  Plaintiff Riverkeeper resides in this District and Division.

8.    Although neither the APA nor the Clean Water Act require the exhaustion of administrative remedies, Riverkeeper has exhausted its administrative remedies or has no administrative remedies for the matters raised herein.

## III.    PARTIES AND STANDING

9.    Plaintiff Riverkeeper is an Alabama nonprofit membership corporation with over 4,000 members that is dedicated to the protection and restoration of the Black Warrior River and its tributaries. Riverkeeper actively supports effective implementation and enforcement of environmental laws, including the Clean

Water Act, on behalf and for the benefit of its members. Riverkeeper's principal place of business is in Birmingham, Alabama, which is in the Northern District of Alabama, Southern Division.

10.    Members of Riverkeeper use and value a number of Alabama's impaired or § 303(d) listed waters for recreation, including but not limited to, paddling, boating, fishing, swimming, wildlife observation and study, nature and landscape observation and photography, and for aesthetic enjoyment. Some members also own property near or adjacent to these waters.

11.    Certain Riverkeeper members are adversely affected by the reduced quality of, or failure to meet water quality standards in, the Alabama streams that the state and EPA wrongly failed to include on Alabama's 2018 § 303(d) List.

12.    Riverkeeper and its members are adversely affected by the failure of EPA to fully identify and list these impaired waters in Alabama, as such streams will not receive the maintenance and improvement of their water quality that occurs by including them on the state's § 303(d) List and subsequent establishment of a TMDL. Riverkeeper's injuries that are caused by EPA can be redressed by this Court.

13.    In addition, Riverkeeper, in furtherance of their organizational goals, uses the type of information that would be available were Alabama or EPA to create an adequate § 303(d) List as required by law. 33 U.S.C. § 1313(d). Riverkeeper's

members and staff gather available information relevant to impaired waters in the Black Warrior basin and the TMDL process, analyze that information, and intend to use it in the future. For example, they have used it in public comments on draft National Pollutant Discharge Elimination System ("NPDES") permits and the Alabama TMDL program. Accordingly, the absence of information required by 33 U.S.C. § 1313(d) directly and adversely affects the informational interests and organizational activities of Riverkeeper.

14.     Defendant Wheeler is the Acting Administrator of the EPA. Pursuant to the Clean Water Act and the regulations promulgated thereunder, he is charged with the supervision and management of all EPA decisions and actions, and with the administration of the Clean Water Act. Mr. Wheeler is sued in his official capacity only.

15.     Defendant Walker is the Acting Regional Administrator of EPA Region 4, which includes the State of Alabama. Pursuant to the Clean Water Act and the regulations promulgated thereunder, she is charged with the supervision and management of EPA decisions and actions, and with the administration of the Clean Water Act in Region 4. Ms. Walker is sued in her official capacity only.

16.     Defendant EPA is the agency of the federal government that has the primary responsibility of administering the Clean Water Act and protecting the waters of the United States from pollution.

## IV. LEGAL BACKGROUND

17.    Congress passed the Clean Water Act ("CWA") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251.

18.    The CWA focuses on two general sources of pollution: point sources and nonpoint sources. Point sources are "any discernible, confined, and discrete conveyance," including pipes, ditches, conduits or vessels "from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Nonpoint sources are any non-discrete source, such as runoff from agriculture, forestry, or construction activity. Point source pollution is subject to technology-based controls through the NPDES permit process, which sets limits on the amount of pollutants that may be released from each point source. Where such controls are inadequate to maintain clean water, the CWA mandates a water quality-based approach. 33 U.S.C. § 1313(d).

19.    Water quality standards are "provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." 40 C.F.R. §131.3(i). Water quality standards are designed "to protect the public health or welfare, enhance the quality of water and serve the purposes" of the CWA. *Id.* States must establish water quality standards based on the uses of the waters and the amount of pollution that would impair those uses, subject to review and approval by EPA. 33 U.S.C. §

6

1313(a)-(c).  States establish these standards at levels necessary to protect the "public health or welfare, enhance the quality of water and serve the purposes of" the Clean Water Act. 33 U.S.C. § 1313(c)(2)(A).

20.     Each state must then identify all waters for which technology-based NPDES permits alone are insufficient to implement applicable water quality standards.  33 U.S.C. § 1313(d)(1)(A). These waters are called Water Quality Limited Segments ("WQLSs").

21.     Having identified all WQLSs within its boundaries, a state must then prioritize them based on "the severity of pollution and the uses to be made of such water." 33 U.S.C. § 1313(d)(1)(A).

22.     States must then develop, in accordance with the priority ranking of the WQLSs, a TMDL for each pollutant identified by the EPA as suitable for such calculation "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). In other words, TMDLs establish the maximum amount of pollutants a water body can receive on a daily basis without violating the state's water quality standards.

23.    A TMDL includes best estimates of pollution from nonpoint sources and natural background sources, pollution from point sources, and a margin of safety. 40 C.F.R. § 130.2(i).

24.    Each state must submit to EPA for its review and approval (or disapproval) a list of WQLSs, known as its CWA § 303(d) List.  Under current EPA regulations, states submit their WQLS lists every two years.  40 C.F.R. § 130.7(d)(1).

25.    As part of its submission to the EPA, states must supply documentation to support decisions to list or not list waters. Such documentation must include, at a minimum, the following information: (1) a description of the methodology used to develop the list, (2) a description of the data and information used to identify waters, (3) a rationale for any decision to not use any existing and readily available data and information and (4) any other reasonable information requested by the Region.  40 C.F.R. § 130.7(b)(6).

26.    Once states submit their lists of WQLSs and TMDLs, EPA must review the submissions within 30 days.  If EPA disapproves of the identification of WQLSs or the list of TMDLs, it has 30 days in which to make its own identification or list. 33 U.S.C. § 1313(d)(2).  Similarly, if a state fails to submit a list of WQLSs or TMDLs, EPA has a mandatory duty to make its own identification or list.  *Id.*

## V. BACKGROUND FACTS

27.    On or about February 11, 2018, Alabama issued its 2018 Draft Section 303(d) List ("Draft List")[2] and Fact Sheet.[3]

28.    As a part of that process, Alabama proposed to delist several streams in the Black Warrior basin.

29.    Among those streams in the Black Warrior basin the state proposed to delist was a segment of Lost Creek (AL03160109-0403-103) (Segment #1) which flows from U. S. Highway 78 at Carbon Hill down to U. S. Highway 78 north of Cedrum, Alabama.  Segment #1 of Lost Creek has been listed as impaired since 1998 due to siltation (habit alteration) from abandoned surface mining.[4]  Lost Creek is a tributary of the Mulberry Fork of the Black Warrior River in Walker County, Alabama, which is in the Northern District of Alabama.

30.    Another segment of Lost Creek (AL03160109-0405-104) (Segment #2) was also proposed for delisting by the 2018 Draft List.  Segment # 2 flows from the mill dam at Cedrum to Alabama Highway 69 at Oakman, Alabama.   Segment #2

---

[2] http://www.adem.state.al.us/programs/water/wquality/Draft2018AL303dList.pdf.

[3] http://www.adem.state.al.us/programs/water/wquality/Draft2018AL303dFactSheet.pdf

[4] http://www.adem.state.al.us/programs/water/wquality/2016AL303dList.pdf.

of Lost Creek has been listed as impaired since 1998 due to siltation (habit alteration) from abandoned surface mining.[5]

31.    The federally endangered Black Warrior waterdog and critically threatened Flattened Musk Turtle, found in the Black Warrior watershed and nowhere else in the world, are known to be in Lost Creek historically[6] and are believed to be there currently.  Siltation has been identified as the biggest threat to the Flattened Musk Turtle; the primary source is from coal mine operations, although runoff from agriculture, forestry and construction also contribute (Dodd, *et al.* 1986).   There is a strong correlation between high siltation levels and population declines of these animals (Ernst *et al.* 1989). Black Warrior waterdog habitat is similar to that of the flattened musk turtle and water quality degradation is the primary threat to its continued existence; Bailey (2000, pp. 19-20) considered water quality degradation to be the primary reason for the extirpation of this species over much of its historical range in the Upper Black Warrior system. The U. S. Fish & Wildlife Service assigned the waterdog a listing priority number of 2, which indicates the amphibian is a species with threats that are both imminent and high in magnitude. 81 Fed. Reg. 69500 (October 6, 2016).

---

[5] *Id.*

[6] E.g., Black Warrior waterdog (http://www.encyclopediaofalabama.org/article/h-4061; Flattened Musk Turtle (https://www.researchgate.net/figure/Adult-Sternotherus-depressus-from-Lost-Creek-Alabama-Left-female-Right-male-Photo_fig2_322603300).

32.    Big Yellow Creek (AL03160112-0201-102) is another stream in the Black Warrior basin the Draft List proposed for delisting.  Alabama has listed Big Yellow Creek as impaired for metals (lead) from abandoned surface mining since 1998.[7]  Big Yellow Creek is a tributary of the Black Warrior River in Fayette and Tuscaloosa Counties, Alabama, which are in the Northern District of Alabama.

33.    On March 13, 2018, Riverkeeper filed public comments on Alabama's Draft List, providing a copy to EPA Region 4.  (Exh. 1).

34.    In those comments, Riverkeeper objected to the delisting of Segment #1 and Segment #2 of Lost Creek as well as the delisting of Big Yellow Creek because available data failed to support the delisting of these waterbodies.

**A. Proposed Delisting of Lost Creek**

35.    Alabama explained its rationale for the proposed delisting of Segment #1 and Segment #2 of Lost Creek in an October 2017 Delisting Decision.[8]  That decision concluded that "available data for Lost Creek indicates that impairment for Siltation (habitat alteration) does not currently exist" so Alabama "will not develop a TMDL due to 'more recent data' which is a just cause for delisting

---

[7] *Id.*

[8] *Delisting Decision for Siltation (Habitat Alteration) for Lost Creek* ("*Delisting Decision*"), http://www.adem.alabama.gov/programs/water/delistings/DraftLostCreekSiltationDelistingRepo rtOctober2017.pdf.

waterbodies according to Title 40 of the Code of Federal Regulations (CFR), Part 130.7(b)(6)(iv)." *Delisting Decision* at 10.

36.    The "more recent data" which Alabama cites in its Delisting Decision is not more recent data at all.  In fact, it is data from monitoring studies that has been available since 2012 and 2013 --- and it largely supplied the factual basis for the continued inclusion of Segment #1 and Segment #2 on Alabama's 2014 and 2016 § 303(d) Lists.[9]

37.    When this data ---bioassessment results and water chemistry analysis--- was originally compiled for Segment #1, the State of Alabama concluded that the "elevated level of total dissolved solids support the continued inclusion of Lost Creek at LOSW-5 on the CWA 303(d) list for siltation" and stated that the "TMDLs for these impairments is [sic] set to be drafted in 2014." *2012 Monitoring Summary for Segment #1* at 2.  Total dissolved solids in this segment averaged 538.5 mg/L at LOSW-5, the collection station where the water chemistry analysis was performed.  *Id*.

38.    Similarly, when this same data was compiled for Segment #2, the State of Alabama concluded that the "elevated level of total dissolved solids support the continued inclusion of Lost Creek at LOSW-1 on the CWA 303(d) list for

---

[9] The 2012 Monitoring Summary for Segment #1 is found at http://www.adem.alabama.gov/programs/water/delistings/DraftLostCreekSiltationDelistingReportOctober2017.pdf ; the 2012 & 2013 Monitoring Summary for Segment #2 is found at http://adem.alabama.gov/programs/water/wqsurvey/table/2012/2012LostCk-ALHwy69.pdf.

siltation" and stated that the "TMDLs for these impairments is set [sic] to be drafted in 2014." *2012 & 2013 Monitoring Summary for Segment #2* at 2. Total dissolved solids in this segment averaged 629.0 mg/L at LOSW-1, the collection station where the water chemistry analysis was performed. *Id.*

39.     Alabama's October 2017 Delisting Decision explicitly relied on the data from the Segment #1 and Segment # 2 Monitoring Summaries, the very data the state used previously to conclude that these waterbodies were impaired. However, in the Delisting Decision, the state cited "additional" 2013 data from two more sampling stations in Lost Creek, LOSW-2 (Segment #2)[10] and LOSW-4 (Segment #1).[11]

40.     Samples of total dissolved solids at LOSW-2 during this time averaged 726.875 mg/L; at LOSW-4 they averaged 324 mg/L. *See* Exh. 2. These concentrations of total dissolved solids are comparable to the averages that Alabama found supported the continued inclusion of these waters on the § 303(d) List in 2014 and 2016. In fact, the average concentration of total dissolved solids

---

[10] EPA Water Quality Portal, found at
https://www.waterqualitydata.us/portal/#countrycode=US&statecode=US%3A01&countycode=US%3A01%3A127&siteid=21AWIC-323&startDateLo=01-01-2012&startDateHi=01-01-2014&mimeType=xlsx.

[11] EPA Water Quality Portal, found at
https://www.waterqualitydata.us/portal/#countrycode=US&statecode=US%3A01&countycode=US%3A01%3A127&siteid=21AWIC-325&startDateLo=01-01-2012&startDateHi=01-01-2014&mimeType=xlsx.

at LOSW-2 even exceeds the average measurements that Alabama relied upon to keep these segments on the state's § 303(d) List in 2014 and 2016.

41.    However, instead of continuing to use total dissolved solids as the necessary benchmark to measure impairment (and any improvement), Alabama arbitrarily changed the rules of the game in 2018.  The state abandoned the total dissolved solids yardstick it had used for previous Lists for a turbidity measurement to evaluate whether the two segments of Lost Creek were impaired for siltation. While Alabama offered an explanation for using turbidity to analyze impairment, it failed entirely to explain why using total dissolved solids was no longer a satisfactory benchmark.   Without explanation, the state also ignored data for total dissolved solids which supported the segments' previous (and continued) inclusion on Alabama's 2018 § 303(d) List.

42.    Even though the metric of total dissolved solids that the state used in the past required Alabama to retain the two segments of Lost Creek on the State's § 303(d) List, the state delisted these waterbodies in its 2018 § 303(d) List.  The state failed to explain its methodology to discard the metric of total dissolved solids to measure impairment nor did the state supply a rationale for the decision not to use the existing and readily available data for total dissolved solids that placed the two segments on the state's previous § 303(d) Lists.  40 CFR § 130.7(b)(6).  While acknowledging that total dissolved solids measurements were higher than

applicable eco-reference values, the state summarily concluded that the inclusion of data for total suspended solids and turbidity was now "sufficient evidence" that Lost Creek was no longer impaired for siltation. *ADEM's Response to Comments Concerning Alabama's Draft 2018 § 303(d) List* (Exh. 2) ("*ADEM's Response*") at 5.

43.    On September 17, 2018, EPA generically approved Alabama's 2018 § 303(d) List as submitted, including the wrongful delistings of Segment #1 and Segment #2 of Lost Creek.

> For all the proposed delistings, the State provided a rationale and/or supporting documentation which the EPA fully considered as part of its review. The EPA concluded that the State's "good cause" justifications were sufficient for the 30 waterbody/pollutant combinations and is approving the delisting of those water quality limited segments from Alabama's section 303(d) list.

EPA's *Approval of the Alabama Department of Environmental Management 2018 §303(d) List Decision Document* at 18.

## B. Proposed Delisting of Big Yellow Creek

44.    The 2016 §303(d) list stated that Big Yellow Creek was impaired for lead from Bankhead Lake to its source and assigned it a "high priority" for the development of a TMDL. *Big Yellow Creek Delisting Decision* (January 2018).[12]

---

[12]http://www.adem.alabama.gov/programs/water/delistings/DraftBigYellowCreekMetalsPbDelistingJanuary2018.pdf.

45.    Alabama did not develop a TMDL; in a sudden reversal, the state instead proposed to delist Big Yellow Creek in 2018.  *Id.*

46.    The Clean Water Act requires the State of Alabama to document its decision to the Region 4 Administrator whether to list or not list its waters as impaired.  40 C.F.R. § 130.7(b)(6).  Part of that documentation must include a description of the methodology the state uses to develop the § 303(d) List.  40 C.F.R. § 130.7(b)(6)(i).

47.    Alabama provided that methodology.  *See Alabama's Water Quality Assessment and Listing Methodology* (January 1, 2018) ("Listing Methodology").[13]

48.    "Alabama's assessment and listing methodology establishes a process, consistent with EPA's guidance, to assess the status of surface waters in Alabama relative to the designated uses assigned to each waterbody" and "is intended to establish a rational and consistent process for reporting the status of Alabama's surface waters relative to their designated uses."  *Id.* at 6.  "It is the intent of the methodology to ensure that an adequate number of samples are available for use in the assessment process.  Id. at 60.  "When a state has by rulemaking adopted a methodology as part of its approved water quality standards and the water quality standards are applicable for CWA purposes, 40 CFR § 131.21, EPA will apply the approved methodology as it reviews the state's submission in order to determine

_____

[13]http://www.adem.alabama.gov/programs/water/wquality/2018WAM.pdf.

whether to approve or disapprove the section 303(d) list." *EPA's Guidance for 2006 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d), 305(b) and 314 of the Clean Water Act* ("EPA 2006 IR Guidance") at 29 (emphasis added.).[14]

49.    Big Yellow Creek is classified for Swimming and Fish & Wildlife use.  Ala. Admin. Code r. 335-6-11-.02.

50.    In order to place waters categorized as Swimming or Fish & Wildlife on the State's § 303(d) List, Alabama is required to evaluate a minimum of eight water samples.  *Listing Methodology* at 26, 36.

51.    In order to remove these waters from the State's § 303(d) List, Alabama must also evaluate a minimum of eight water samples.  *Listing Methodology* at 61 (Table 18).

52.    Despite establishing a prescribed minimum number of samples in the Listing Methodology, the State of Alabama supplied only seven water chemistry samples as its basis to delist Big Yellow Creek for lead.  *Big Yellow Creek Delisting Decision* at 10.  In its delisting decision, the state supplied no explanation or rationale for deviating from the established sampling methodology that is required to develop the list.  *See* 40 C.F.R. § 130.7(b)(6); *ADEM's Response* at 10.

---

[14] https://www.epa.gov/sites/production/files/2015-10/documents/2006irg-report.pdf.

53.   On September 17, 2018, EPA generically approved Alabama's 2018 §

303(d) List as submitted, including the delisting of Big Yellow Creek in violation

of ADEM's Listing Methodology.  EPA's *Approval of the Alabama Department of*

*Environmental Management 2018 §303(d) List Decision Document* at 18.

## VI.   CLAIM FOR RELIEF

**EPA's Approval of Alabama's Delisting of Waters from the 2018 § 303(d) List**
**Contravenes the CWA and is Actionable under the APA.**

54.   Riverkeeper hereby incorporates all preceding paragraphs, as if repeated

verbatim herein.

55.   Alabama's 2018 § 303(d) List as approved by EPA did not include all

WQLSs as required by the Clean Water Act's § 303(d). The State removed

waterbodies from the § 303(d) List that had previously been determined not to be

meeting water quality standards, without the required supporting evidence that they

now meet standards.

56.   "Each State shall assemble and evaluate all existing and readily available

water quality-related data and information to develop" its § 303(d) list.  40 C.F.R.

§ 130.10(d)(6); 40 CFR § 130.7(b)(5).  "Each state shall provide documentation to

the Regional Administrator to support the state's determination to list or not to list

waters."  40 CFR § 130.10(d)(7).  In approving Alabama's 2018 § 303(d) List,

EPA did not comply with § 130.10(d)(6) and § 130.7(b)(5) because it accepted

Alabama's decision to delist waters in instances where the state failed to supply "good cause."   40 C.F.R. § 130.7(b)(6)(iv).  EPA did not have adequate evidence that these waters are now meeting water quality standards.

57.    Alabama did not submit and EPA did not review all existing and readily available water quality data to delist Segment #1 and Segment #2 of Lost Creek. Additional sample measurements of total dissolved solids for these segments (from LOSW-2 and LOSW-4), when reviewed with habitat assessments and bio-assessment results, demonstrate that Segment #1 and Segment #2 of Lost Creek remain impaired for siltation.  Alabama also failed to justify why the metric of total dissolved solids was no longer appropriate to measure impairment and EPA accepted that decision without challenge.

58.    EPA lacked evidence to approve the delisting of Big Yellow Creek because Alabama did not demonstrate "good cause."   The state failed to submit the minimum number of sample results (eight) required by the ADEM Listing Methodology to delist a waterbody, nor did Alabama address or support this deviation.  *ADEM's Response* at 10.   In making its decision to approve or disapprove Alabama's 2018 Draft § 303(d) List, EPA is supposed to apply the state's approved listing methodology, yet EPA did not.  EPA 2006 IR Guidance at 29.

59.    EPA guidance describes categories where a water body may be removed from a state's 303(d) list without the development of a TMDL. Two are relevant here: 1) if evidence shows it is meeting all applicable water quality standards; or 2) if the original basis for delisting is determined to be inaccurate. EPA 2006 IR Guidance at 58.[15] Absent one of these appropriately documented reasons, EPA may not approve a state's request to delist an impaired waterbody.

60.    EPA approved delisting two segments of Lost Creek on the 2018 § 303(d) list despite the fact that the Alabama's water quality monitoring for total dissolved solids during the relevant time period explicitly demonstrates that these waters continue to be impaired for siltation.

61.    EPA approved the delisting of Big Yellow Creek even though Alabama failed to follow its own Listing Methodology to evaluate and submit the minimum number of eight water quality samples required to delist a waterbody and even though EPA is supposed to apply that Listing Methodology in deciding whether to approve Alabama's decisions to list or delist waterbodies.

62.    EPA failed its duty to require Alabama to provide (and adhere to) an articulated methodology for delisting waterbodies and to provide a defensible rationale for the state's decision not to use existing data in making those determinations. 40 C.F.R. § 130.10(d)(7). EPA similarly failed its duty to require

---

[15] https://www.epa.gov/sites/production/files/2015-10/documents/2006irg-report.pdf.

adequate documentation to support Alabama's determination not to list waters described herein. *Id.*

63.    Based on the above, EPA's approval of Alabama's 2018 § 303(d) list and its approval of the delisting or removal of waters from that list are arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law, contrary to the APA, 5 U.S.C. § 706(2)(A). Further, EPA's failure to disapprove the 2018 § 303(d) list constitutes agency action unlawfully withheld or unreasonably delayed, in contravention of the APA, 5 U.S.C. § 706(1).

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Riverkeeper prays for relief as follows:

64.    That the court issue a declaratory judgment that:

a) Defendants are in violation of the Clean Water Act and Administrative Procedure Act as alleged herein and that the State of Alabama's 2018 § 303(d) list is void and of no effect;

b) that EPA's approval of the state's 2018 § 303(d) list was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

c) that EPA's approval of Alabama's delisting and removal of waters from the 2018 § 303(d) list as described in this Complaint was arbitrary and

capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

d) that EPA's failure to disapprove Alabama's 2018 § 303(d) list constitutes agency action unlawfully withheld or unreasonably delayed, in violation of the APA, 5 U.S.C. § 706(2)(A).

65.    That the Court set aside the EPA approval of the 2018 § 303(d) List and remand the list to EPA with instructions to disapprove the list and establish its own list within 60 days of the disapproval, this list to include the waters and pollutant combinations identified in this Complaint as wrongfully omitted from Alabama's 2018 § 303(d) list.

66.    For all of Riverkeeper's costs, expenses and reasonable attorney fees as authorized by 28 U.S.C. § 2412;

67.    For any and all other relief that the court deems just and proper.

Respectfully submitted this 27th day of February, 2019.

Eva L. Dillard
ASB-4118-A59E
Attorney for Plaintiff
Black Warrior Riverkeeper, Inc.
710 37th Street South
Birmingham, AL 35222
(205) 458-0095 (tel.)
(205) 458-0094 (fax)
edillard@blackwarriorriver.org

22