UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BLACK WARRIOR RIVERKEEPER, INC., | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) Case No.: 2:19-cv-00344-JHE |
| ENVIRONMENTAL PROTECTION AGENCY, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**[1]

In this Administrative Procedure Act ("APA") case, Plaintiff Black Warrior Riverkeeper, Inc. ("Riverkeeper") asserts that Defendant Environmental Protection Agency ("EPA") arbitrarily and capriciously approved Alabama Department of Environmental Management's ("ADEM") delisting of two waterbodies from Alabama's Clean Water Act ("CWA") § 303(d) list. (Doc. 44). Riverkeeper and Defendants EPA, Acting Administrator Andrew Wheeler, and Acting EPA Regional Administrator for Region 4 Mary Walker (collectively "Defendants") filed cross-motions for summary judgment. (Docs. 51 & 53). Each party filed a response to the opposing party's motion. (Docs. 55 & 56). The motions are fully briefed and ripe for review. For the reasons stated below, Riverkeeper's motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **GRANTED**.

**I. Legal Standard**

Ordinarily, Rule 56 governs the Court's review of a motion for summary judgment, and

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 16).

the Court would grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But this case involves judicial review of allegedly arbitrary and capricious agency action, so the APA, 5 U.S.C. § 706(2)(A), establishes the standard of review. *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1114 (11th Cir. 2013). *See also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law.") (footnote omitted).

Under the APA, a court shall "set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, a court must "assess only whether the decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). *See Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996) (calling the arbitrary and capricious standard "exceedingly deferential"). Under the narrow standard of review, the Supreme Court "insist[s] that an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43)). And agency action may be found arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

## II. Background

### A. CWA § 303(d) Lists

The CWA "divides between the federal government (via the EPA) and the states many of the duties for monitoring and regulating the nation's waters." *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 907 (11th Cir. 2007). The states must establish water quality standards ("WQS") for waterbodies within their boundaries. 33 U.S.C. § 1313(a)-(c). "To do this, a state must first designate the use (or uses) to be made of a waterbody, such as water supply, fishing, or swimming. 40 C.F.R. § 131.2. Then, the state must determine the water quality criteria necessary to safely permit the designated use. *Id.* §§ 131.2, 131.3(b). Those criteria become the 'water quality standard' for the waterbody. *Id.* §§ 131.2, 131.3(i)." *Leavitt*, 488 F.3d at 907.

The CWA requires states to then "compile a list of waterbodies that are not safe enough to support their designated uses, i.e., that do not meet their water quality standards." *Leavitt*, 488 F.3d at 907 (citing 33 U.S.C. § 1313(d)(1)(A)). Waterbodies that do not meet water quality standards are called Water Quality Limited Segments ("WQLS"). 40 C.F.R. § 130.2(j). States must develop a Total Maximum Daily Load ("TMDL") for each WQLS that specifies "the maximum amount of a particular pollutant that can pass through a waterbody each day without water quality standards being violated." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1025 (11th Cir. 2002) (citing 33 U.S.C. § 1313(d)(1)(C)).

The list of WQLSs that a state compiles is called the CWA § 303(d) list. *See* 33 U.S.C. § 1313(d). "The placement of a waterbody on a state's [§ 303(d)] list is significant because the

CWA requires that states target WQLSs for pollution control." *Leavitt*, 488 F.3d at 908. A state must "assemble and evaluate all existing and readily available water quality-related data and information to develop" its § 303(d) list. 40 C.F.R. § 130.7(b)(5).

Each state must submit its § 303(d) list to EPA every two years for review and approval or disapproval. 40 C.F.R. § 130.7(d)(1). A state must support its § 303(d) list with (1) "[a] description of the methodology used to develop the list"; (2) "[a] description of the data and information used to identify waters, including a description of the data and information used by the State as required by [40 C.F.R.] § 130.7(b)(5)"; (3) "[a] rationale for any decision to not use any existing and readily available data and information"; and (4) "[a]ny other reasonable information" requested by EPA. 40 C.F.R. § 130.7(b)(6)(i)-(iv).

EPA has 30 days after submission to either approve or disapprove the § 303(d) list. 40 C.F.R. § 130.7(d)(2). EPA will approve the list "only if it meets the requirements of [40 C.F.R.] § 130.7(b)." *Id.*

### B. Alabama's 2018 § 303(d) List

On February 11, 2018, ADEM issued Alabama's 2018 § 303(d) list. (Doc. 1-1 at 1). In it, ADEM proposed delisting several streams in the Black Warrior River Basin, including a segment of Big Yellow Creek and two segments of Lost Creek. (*Id.*). In prior § 303(d) lists, ADEM listed Big Yellow Creek as impaired for lead and listed Lost Creek as impaired for siltation/habitat alteration. (*Id.*). ADEM decided in 2018 that data no longer supported those impairments. (Doc. 20-11 at 80, EPA 2878; doc. 20-12 at 16, EPA 2937).

ADEM's water quality assessment and listing methodology—published documentation that "establishes a process consistent with EPA's guidance to assess the status of surface waters in Alabama relative to the designated uses assigned to each waterbody," (doc. 20-8 at 197, EPA

2410)—provided that ADEM would measure a minimum of eight water samples before delisting a water classified, as Big Yellow Creek was, for swimming and fish and wildlife use.  (Doc. 20-9 at 12, EPA 2465); *see* Ala. Admin Code r. 335-6-11-.02.  However, in delisting Big Yellow Creek in 2018, ADEM relied on only seven water samples collected in 2014.  (Doc. 20-12 at 14, EPA 2395).  None of the samples violated the WQS for lead.  (*Id.*).

In delisting two segments of Lost Creek, ADEM relied on excerpted water chemistry data collected from four monitoring stations, and habitat and macroinvertebrate assessments from two monitoring stations.  (Doc. 20-11 at 71, EPA 2869); (*see* doc. 22-1 at 8-11) (two monitoring studies with complete water chemistry data showing ADEM relied on excerpted data).[2]  ADEM conducted a Total Suspended Solids ("TSS")[3] and turbidity analysis on the water chemistry data.  (Doc. 20-11 at 76-80, EPA 2874-78).  The habitat and macroinvertebrate assessments were conducted in 2012.  (*Id.*).  Based on those analyses and assessments, ADEM found that the two segments of Lost Creek did not violate the WQS for siltation/habitat alteration.  (*Id.* at 80, EPA 2878).

On April 2, 2018, EPA approved Alabama's 2018 § 303(d) list.  (Doc. 20-9 at 129-31, EPA 2582-84).  In doing so, EPA stated that ADEM "provided a rationale and/or supporting documentation" for each delisting, provided "good cause" justifications for each delisting, and relied on "new water quality data . . . that indicated that WQSs are currently being attained."  (*Id.* at 129, EPA 2582).

---

[2] In granting in part Riverkeeper's motion to supplement the administrative record with the two monitoring studies, (doc. 21), the Court found that it could consider the monitoring studies as extra-record evidence.  (Doc. 29 at 6-8).

[3] According to EPA, suspended solids "float in the water column and are principally kept aloft due to stream flow.  They can easily fall out of suspension due to gravity when flow conditions warrant and collect on the stream bottom resulting in siltation."  (Doc. 50-12 at 115, EPA 5256).

**C. Alabama's 2020 § 303(d) List**

On May 1, 2020, ADEM issued Alabama's 2020 § 303(d) list. (Doc. 50-12 at 57, EPA 5198). Like the 2018 § 303(d) list, the 2020 list excluded Big Yellow Creek and Lost Creek. (S*ee id.* at 113-15, EPA 5254-56). ADEM did not revisit those delistings in its 2020 documentation submitted to EPA. (*See* doc. 50-11 at 102-40, EPA 5039-77). However, EPA, in its decision document approving the 2020 list, provided "additional supporting rationale for its approval of the State's continued decision not to include Big Yellow Creek and Lost Creek on its 303(d) List." (Doc. 50-12 at 113, EPA 5254).

EPA stated that the seven water samples on which ADEM relied in delisting Big Yellow Creek in 2018 supported the continued delisting because, although ADEM's water quality assessment and listing methodology established a minimum of eight water samples, the minimum data specifications "are not intended to exclude data and information from the assessment process, but are a guide for use in designing monitoring activities to assess the State's surface waters." (Doc. 50-12 at 114, EPA 5255). EPA noted also that ADEM's methodology required it to document decisions that deviated from minimum data specifications, which, according to EPA, ADEM did. (*Id.*). EPA also stated that because ADEM's assessment methodology was not a part of its EPA-approved WQS, EPA could, and did, find ADEM's decision to delist Big Yellow Creek "a reasonable interpretation of the state's WQS and sound science" notwithstanding the number of water samples tested. (*Id.*).

EPA supported ADEM's decision to rely on TSS data in deciding to delist Lost Creek for siltation. (Doc. 50-12 at 115, EPA 5256). Contrasting how suspended solids and dissolved solids affect water quality, EPA found that TSS data is "more directly relevant to siltation" than total

6

dissolved solids ("TDS")[4] data, which was the kind of data ADEM used in initially listing Lost Creek for siltation in 1998. (*Id.*). EPA described the macroinvertebrate and habitat assessments conducted on Lost Creek and found ADEM's reliance on them to be a "reasonable scientific judgment." (*Id.*).

### D. Procedural History

Riverkeeper initiated this action on February 27, 2019. (Doc. 1). In its original complaint, Riverkeeper asserted one cause of action against EPA under the APA, 5 U.S.C. § 706(2)(A), alleging that EPA's approval of Alabama's 2018 § 303(d) list was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. (*Id.* at 18-21). Riverkeeper also alleged that EPA's failure to disapprove the 2018 list was agency action unlawfully withheld or unreasonably delayed that could be compelled under the APA, 5 U.S.C. § 706(1). (*Id.* at 21, ¶ 63).

On August 1, 2019, EPA filed the administrative record of its decision to approve Alabama's 2018 § 303(d) list. (Doc. 20). Riverkeeper then filed a motion to supplement the administrative record with two Lost Creek monitoring studies, (doc. 21), which the undersigned granted in part, (doc. 29). The undersigned found the Court could consider the two monitoring studies as extra-record evidence. (*Id.* at 6-8). But EPA had not considered those documents in its 2018 decision, so EPA moved to voluntarily remand this case to the agency so it could consider the monitoring studies. (Doc. 30).

Before the undersigned could rule on EPA's motion to remand, ADEM submitted and EPA approved Alabama's 2020 § 303(d) list. (*See* doc. 39). Riverkeeper also challenged that approval. (*See* doc. 44). So, with permission, (*see* doc. 43), Riverkeeper filed an amended complaint alleging

---

[4] According to EPA, dissolved solids "tend to remain in suspension in the water column under most flow conditions and do not readily settle out due to gravity to form silt." (Doc. 50-12 at 115, EPA 5256).

that EPA's approval of the 2018 list and the 2020 list was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA. (Doc. 39 at 21-24). Riverkeeper also alleged that EPA's failure to disapprove the 2018 list and the 2020 list was agency action unlawfully withheld or unreasonably delayed that could be compelled under the APA, 5 U.S.C. § 706(1). (*Id.* at 24, ¶ 73). The amended complaint is now the operative pleading.

### III. Analysis

#### A. Standing

An issue of standing exists only with respect to Riverkeeper's claim concerning EPA's 2018 decision. EPA disputes Riverkeeper's standing to challenge EPA's approval of Alabama's 2018 § 303(d) list because that list is no longer in effect; according to EPA, EPA's 2020 approval superseded its 2018 approval. (Doc. 54 at 22-23). EPA contends that the 2018 list is not causing Riverkeeper any injury and the Court could not redress any injury caused by it. (*Id.*). For the same reasons, EPA contends that Riverkeeper's challenge to EPA's 2018 action is moot. (*Id.* at 21-22). The undersigned addresses those arguments and Riverkeeper's standing together.

The "irreducible constitutional minimum of standing" under Article III requires a plaintiff to establish (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) that it is "likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and quotations omitted). Riverkeeper's claim based on EPA's 2018 action fails each element.

Pursuant to the two-year iterative § 303(d) list process, Alabama's 2020 list replaced the 2018 list and is now the operative listing of Alabama's WQLSs and TMDLs. The 2018 list effectively does not exist, is causing no injury, and presents no live controversy. Moreover, a

favorable decision in this case could not redress any injury allegedly caused by EPA's 2018 decision. Remanding the approval of Alabama's 2018 list would have no effect because that list is no longer in effect. The undersigned cannot compel EPA to retroactively approve the 2018 list because that would subvert the CWA's biennial listing process.

For the same reasons, Riverkeeper's challenge to EPA's 2018 decision is moot. EPA's 2020 approval superseded the 2018 approval, so the challenge to the 2018 approval does not present a live controversy. *See Sierra Club v. U.S. E.P.A.*, 315 F.3d 1295, 1300-01 (11th Cir. 2002) (finding moot the petitioner's challenge to EPA's approval of a state's motor vehicle emissions budget under the Clean Air Act because EPA's later approval of the state's implementation plan containing the same budget superseded the first approval); *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) ("TRCP seeks relief . . . based on the Bureau [of Land Management's] failure to enforce the 2000 Record of Decision. But that Record of Decision no longer exists; the Bureau's 2008 Record of Decision superseded the 2000 Record of Decision 'in its entirety.'").

Riverkeeper does have standing to challenge EPA's 2020 decision, which EPA does not dispute. Riverkeeper has submitted six declarations from its members[5] containing testimony that EPA's approval of Alabama's 2020 § 303(d) list has caused Big Yellow Creek and Lost Creek to not receive treatment for pollution, which has caused the members injuries in fact by impairing boating, swimming, nature study, photography, and aesthetic enjoyment. (Doc. 52-1 at 10-55). Those alleged injuries are fairly traceable to EPA's decision; by approving Alabama's 2020 list

---

[5] "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Riverkeeper satisfies this standard.

9

that did not include Big Yellow Creek and Lost Creek, EPA released Alabama from the CWA obligation to develop a TMDL for those waters and target those waters for pollution control. And a favorable decision in this case can redress those injuries. If the undersigned finds that EPA unlawfully withheld or unreasonably delayed a decision to disapprove Alabama's 2020 list, the undersigned must compel that disapproval under the APA. 5 U.S.C. § 706(1). And if the undersigned finds EPA's 2020 decision arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, then the undersigned must set aside EPA's decision under the APA. *Id.* § 706(2)(A). EPA then might disapprove Alabama's list and order the state to list Big Yellow Creek and Lost Creek, which would redress Riverkeepers' members' alleged injuries.

For the foregoing reasons, EPA's decision in 2020 to approve ADEM's continued delisting of Big Yellow Creek and Lost Creek is the only agency action reviewable by the Court. EPA's 2018 decision is relevant only to the extent that EPA incorporated ADEM's reasons for delisting the waterbodies in 2018 into EPA's reasons for approving the continued delisting in 2020.[6]

### B. EPA's Approval of ADEM's Decision to Continue to Delist Big Yellow Creek in 2020

EPA supported its approval of ADEM's decision to delist Big Yellow Creek in 2018 with a brief explanation: "For all the proposed delistings, the State provided a rationale and/or supporting documentation which the EPA fully considered as part of its review. The EPA concluded that the State's 'good cause' justifications were sufficient for the 30

---

[6] The distinction between "delisting" and "continued delisting" is important. In 2018, EPA reviewed ADEM's explanation for why it delisted Big Yellow Creek and Lost Creek that year. In 2020, EPA reviewed ADEM's submission of a § 303(d) list that did not include Big Yellow Creek and Lost Creek; i.e., a "continued delisting." These are two separate actions. And EPA was within its power in reviewing a continued delisting because the CWA does not limit EPA's scope of review only to waterbodies in their first instance of listing or delisting. *See* 33 U.S.C. § 1313(d); 40 C.F.R. 130.7(d).

waterbody/pollutant combinations and is approving the delisting of those water quality limited segments from Alabama's section 303(d) list." (Doc. 20-9 at 129, EPA 2582). EPA supported its approval of ADEM's decision to continue delisting Big Yellow Creek in 2020 with a much more detailed explanation; as discussed above, EPA provided "additional supporting rationale for its approval of the State's continued decision not to include Big Yellow Creek," which included explanations for why testing seven water samples for lead supported ADEM's decision. (Doc. 50-12 at 114-15, EPA 5254-55). Riverkeeper asserts that the undersigned must disregard that "additional supporting rationale" provided in 2020. (Doc. 52 at 16-18). According to Riverkeeper, that "additional supporting rationale" is an impermissible *post hoc* rationalization that cannot save otherwise unlawful agency action under *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020). For the following reasons, the undersigned disagrees.

In *Regents*, the Supreme Court found that the U.S. Department of Homeland Security's decision to rescind the Deferred Action for Childhood Arrivals program was arbitrary and capricious under the APA. 140 S. Ct. at 1913. In doing so, the Supreme Court limited the agency to the reasons for its decision given at the time it made the decision. *Id.* at 1908. The Supreme Court noted, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). So the agency could not defend its decision with a memorandum that provided reasons additional to those given in a prior memorandum of the agency's original reasons. *Id.* at 1908. Instead, the agency had two options: (1) "rest on the [original memorandum] while elaborating on its prior reasoning[;]" or (2) "issue a new rescission bolstered by new reasons." *Id.* The agency chose the first option, so the agency was "limited to the agency's original reasons," and the Supreme Court viewed the agency's explanation critically

"to ensure that the rescission is not upheld on the basis of impermissible 'post hoc rationalization.'" *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

Here, in contrast, EPA chose the second option: it took a new agency action in 2020 and gave independent reasons for it. In 2018, EPA approved ADEM's decision to delist Big Yellow Creek. In 2020, EPA approved ADEM's "continued decision not to include Big Yellow Creek and Lost Creek on its 303(d) List." (Doc. 50-12 at 113, EPA 5254). These are two separate actions with two separate explanations. EPA's "additional supporting rationale" provided in 2020 is not an additional explanation for the agency's 2018 action; it is an explanation for the agency's 2020 action. The undersigned will consider EPA's "additional supporting rationale" in its 2020 decision document.

The administrative record demonstrates that EPA's decision to approve ADEM's continued delisting of Big Yellow Creek was not arbitrary or capricious. It is true that ADEM tested only seven water samples from Big Yellow Creek, and ADEM's own listing methodology establishes a minimum of eight water samples. (Doc. 20-12, EPA 2465). But, ADEM's failure to follow its methodology is not EPA's failure under the CWA or the APA. EPA's duty on review of ADEM's proposed § 303(d) list was first to analyze whether the list "[met] the requirements of [40 C.F.R.] § 130.7(b)." 40 C.F.R. § 130.7(d)(2). In other words, EPA had to ensure that ADEM "assemble[d] and evaluate[d] all existing and readily available water quality-related data and information[;]" submitted a description of the methodology and data used to develop the list; had a "rationale for any decision to not use any existing and readily available data and information[;]" and, if requested by EPA, demonstrated "good cause for not including a water or waters on the list," including, but not limited to, "more recent or accurate data." 40 C.F.R. § 130.7(b)(5)-(6).

EPA, in explicitly addressing ADEM's seven water samples, reasonably found that ADEM complied with these requirements.

EPA first described the listing history of Big Yellow Creek, noting that Alabama listed it originally in 1998 for metals and pH based on data collected between 1967 and 1984, delisted the pH impairment in 2000 after finding compliance with the pH WQS, refined the metals impairment to chromium and lead in 2006, and delisted the chromium impairment in 2012 based on data collected in 2008. (Doc. 50-12 at 113-14, EPA 5254-55). Following this pattern of delisting impairments based on updated data, EPA explained that ADEM delisted the lead impairment in 2018 based on seven water samples taken in 2014 that did not exceed the lead WQS. (*Id.* at 114, EPA 5255). Mentioning "specifically the age of data initially showing impairment and the more recent data that do not show an exceedance of the lead WQC," EPA reasonably found that ADEM relied on more recent data and made a "scientifically reasonable" decision. (*Id.*). EPA considered all relevant factors—namely the recency of the water samples and their negative test results—and reached a logical and satisfactorily explained conclusion. Such a decision is neither arbitrary nor capricious. *See Regents*, 140 S. Ct. at 1905.

EPA did not leave any crucial stone unturned in explaining why the number of water samples was not fatal to Alabama's 2020 § 303(d) list. Most importantly, EPA noted how it (EPA) was not required to apply ADEM's eight-sample requirement because that requirement was not found in Alabama's EPA-approved WQS. (Doc. 50-12 at 114, EPA 5255). EPA is required to apply a state's methodology when reviewing a § 303(d) list only when the state "has by rulemaking adopted a methodology as part of its approved water quality standards and the water quality standards are applicable for CWA purposes." (Doc. 20-3 at 126, EPA 379).

If the state has not by rulemaking adopted a methodology into its EPA-approved WQS, then EPA will consider the state's methodology only "to the extent that it reflects a reasonable interpretation of the state's water quality standards and sound science." (*Id.*). Alabama had not by rulemaking adopted the eight-sample minimum as part of its EPA-approved WQS, so EPA was not obligated to apply it. (Doc. 50-12 at 114, EPA 5255).

Moreover, the CWA regulations did not explicitly require EPA to consider or apply Alabama's methodology. Rather, EPA only had to review whether Alabama "provide[d] . . . [a] description of the methodology used to develop the [§ 303(d)] list." 40 C.F.R. § 130.7(b)(6). EPA correctly found that Alabama did. From there, EPA had to consider whether Alabama had good cause for not including Big Yellow Creek on the list. *See id.* § 130.7(b)(6)(iv). EPA reasonably concluded that seven recent water samples showing no impairment for lead was good cause.

Nevertheless, Riverkeeper identifies what it considers questionable circumstances surrounding ADEM's decision to delist Big Yellow Creek that renders EPA's approval of ADEM's 2020 list arbitrary and capricious. First, Riverkeeper argues that ADEM arbitrarily treated like situations differently because ADEM tested eight or more water samples for all other waterbodies delisted in 2018 and 2020. (Doc. 52 at 19-20). Although, "[a] long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently[,]" *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing *Motor Vehicle Mfrs.*, 463 U.S. at 57), EPA has not offered insufficient reasons for treating similar situations differently. If EPA had, for example, approved the delisting of Big Yellow Creek but disapproved the delisting of another waterbody because ADEM did not test at least eight water samples from that other waterbody, then EPA may have treated similar situations differently. EPA did not do so. Instead, EPA reasonably explained its decision to

approve the continued delisting of Big Yellow Creek notwithstanding ADEM's use of only seven water samples. Riverkeeper has only identified differences in the data sets corresponding to different delisted waterbodies; Riverkeeper has not shown inconsistent EPA decision-making.

Next, Riverkeeper contends that ADEM did not use "more recent data" under 40 C.F.R. § 130.7(b)(6) because ADEM collected the seven Big Yellow Creek water samples in 2014 but did not delist Big Yellow Creek in 2016. (Doc. 52 at 20-21). Riverkeeper questions why ADEM found Big Yellow Creek impaired in 2018 but unimpaired in 2016 when the same data was available. (*See id.*). The reason why ADEM did not delist Big Yellow Creek in 2016 is not relevant to whether EPA made an arbitrary or capricious decision in 2020 when it approved the continued delisting of Big Yellow Creek. Riverkeeper once again conflates ADEM's methodology with EPA's obligations under the CWA and the APA. Moreover, many reasons could exist for why ADEM did not delist Big Yellow Creek in 2016, and even if the undersigned were to assume nefarious motives from a record that is silent on the matter, that alone would not render EPA's 2020 decision arbitrary or capricious.

Finally, Riverkeeper challenges the weight EPA assigned to the recency of the Big Yellow Creek water samples. (Doc. 52 at 24-25). Riverkeeper notes how EPA relied in part on how the 2014 water samples were the most recent samples, but questions why ADEM relied on much older data—some predating 1967—in listing 67 other waterbodies as impaired in 2018. (*Id.*). This argument also misses the mark. The fact that old data supported findings of impairment in other waterbodies does not change the fact that recent data supported a finding of non-impairment in Big Yellow Creek.

**C. EPA's Approval of ADEM's Decision to Continue to Delist Lost Creek in 2020**

For the same reasons argued with respect to Big Yellow Creek, Riverkeeper asserts that the undersigned must disregard EPA's "additional supporting rationale" given in 2020 for approving the continued delisting of Lost Creek. (Doc. 52 at 16-18). But, as explained above, EPA's "additional supporting rationale" given in 2020 explains EPA's 2020 action; it is not an impermissible *post hoc* rationalization for a past action. The undersigned will consider EPA's explanation for approving the continued delisting of Lost Creek given in the agency's 2020 decision document.

The administrative record demonstrates that EPA's decision to approve ADEM's continued delisting of Lost Creek was not arbitrary or capricious. As described above, EPA relied on two sources of information in approving ADEM's decision: TSS and turbidity data, and habitat and macroinvertebrate assessments. (Doc. 50-12 at 115-16, EPA 5256-57). EPA explained that ADEM measured 30 TSS and turbidity samples taken between 2012 and 2013 from four monitoring stations. (*Id.* at 116, EPA 5257). None of the turbidity samples exceeded the applicable turbidity criterion, and the TSS data revealed that Lost Creek met the siltation WQS. (*Id.*). EPA provided a detailed explanation of ADEM's habitat and macroinvertebrate assessments, describing how macroinvertebrate metrics are "based on observations and data from reference streams similar in hydrology, ecology, and relative size," how habitat assessments are similarly "based on ecoregional reference characteristics and are useful to assess the extent of siltation and its impacts on in-stream physical conditions and the health of aquatic communities," and how the two metrics combine to form biological indices that "provide a quantitative score of the condition of aquatic communities which help determine the waterbody's degree of aquatic life use support." (*Id.*). Those metrics demonstrated that the two delisted segments of Lost Creek supported aquatic

life and were not impaired by small-sized particles based specifically on "documented sediment deposition parameters and observations of the particle size distribution at both stations." (*Id.*). EPA clearly explained the factors it considered, reasonably interpreted the data, and reached a sound conclusion. Therefore, EPA did not make an arbitrary or capricious decision. *See Regents*, 140 S. Ct. at 1905.

Perhaps most importantly, EPA explained why ADEM reasonably switched from TDS data to TSS data in finding no siltation impairment. (Doc. 50-12 at 115, EPA 5256). ADEM relied on TSS data in 2018 but relied on TDS data in the preceding twenty years. (*Id.*). Riverkeeper questions why ADEM suddenly switched to TSS data and consequently found non-impairment for the first time in twenty years. (*See* doc. 52 at 27-30). Indeed, if ADEM had no reasonable explanation for the switch, then EPA's approval of ADEM's decision could potentially be arbitrary.

That is not the case here. EPA clearly explained why ADEM reasonably relied on TSS data:

> EPA concurs with [relying on TSS data] because TDS is not commonly used as an indicator for siltation because dissolved solids tend to remain in suspension in the water column under most flow conditions and do not readily settle out due to gravity to form silt. In contrast, suspended (undissolved) solids float in the water column and are principally kept aloft due to stream flow. They can easily fall out of suspension due to gravity when flow conditions warrant and collect on the stream bottom resulting in siltation. Based on the scientific principles of siltation described above, the EPA concurs that TSS is a more relevant tool for evaluating siltation impairment than TDS.

(Doc. 50-12 at 115, EPA 5256). This explanation is precisely the kind of scientific determination based on an agency's special expertise to which courts should be most deferential. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). The undersigned will not second-guess EPA's sound scientific conclusion supported by a clear explanation of how TSS and

TDS affect water quality. *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) ("The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.") (internal quotation marks omitted).

Next, Riverkeeper challenges ADEM's decision based on the source of the TSS data. ADEM found the TSS data in two monitoring studies from 2012 and 2013. (Doc. 22-1). However, those monitoring studies also contained TDS data showing siltation and concluded that "[t]he elevated level of total dissolved solids support the continued inclusion of Lost Creek . . . on the CWA 303(d) list for siltation." (*Id.* at 3, 6). Riverkeeper asserts that ADEM inappropriately cherry-picked the TSS data and ignored the conflicting TDS data and conclusion of impairment. (Doc. 52 at 26-30). Riverkeeper contends that EPA took arbitrary and capricious action by approving such a decision. (*Id.* at 29-32). The undersigned disagrees.

The fact that the monitoring studies supported a finding of impairment based on TDS data does not render EPA's decision arbitrary or capricious. Again, EPA clearly and reasonably explained why TSS was a better metric for siltation than TDS. (Doc. 50-12 at 115, EPA 5256). ADEM's reliance on TDS data in prior years did not prevent it from modifying its data analysis based on an updated understanding of TSS. After all, science evolves.

Also, EPA directly addressed the conclusions reached in the monitoring studies that conflicted with ADEM's decision. (*See* doc. 50-12 at 116 n.13). EPA found that ADEM was not bound to those prior conclusions as long as ADEM, pursuant to EPA's review of a state's proposed § 303(d) list, "identified [a] reasonable and scientifically sound basis for its current position." (*Id.*). EPA explained again that ADEM reached a scientifically sound decision because TSS is a

18

more accurate measure of siltation than TDS. (*Id.*). Again, the undersigned will not substitute his judgment for EPA's reasonable scientific conclusion concerning TSS.

## IV. Conclusion

For the reasons stated above, the undersigned finds that EPA's approval of Alabama's continued delisting of Big Yellow Creek and Lost Creek in 2020 was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and EPA did not unlawfully withhold a decision to disapprove Alabama's 2020 § 303(d) list. Therefore, EPA did not violate the APA. Riverkeeper's motion for summary judgment, (doc. 51), is due to be **DENIED** and Defendants' motion for summary judgment, (doc. 53), is due to be **GRANTED**. A separate order will be entered.

DONE this 11th day of March, 2021.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE